IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ROCIO CARMEN SISKA
ALEXANDER, et al.,
      Plaintiffs,

vs.                            Case No. 5:10cv209/RS/CJK

JAN FREDERICK LUBBE, et al.,
      Defendants.

---

## REPORT AND RECOMMENDATION

Plaintiff, a non-prisoner proceeding *pro se* and *in forma pauperis*, has filed a third amended civil rights complaint pursuant to 42 U.S.C. § 1983. (Doc. 11). Upon review of the amended complaint, the court concludes that plaintiff has not presented an actionable claim, and that dismissal of the case is warranted.

## BACKGROUND AND PROCEDURAL HISTORY

Plaintiff, Rocio Carmen Siska Alexander ("Alexander"), on behalf of her two minor children, initiated this lawsuit on August 6, 2010. (Doc. 1). In her third amended complaint, filed on November 30, 2010 (doc. 11), plaintiff joined her son, Alejandro Alexander ("Alejandro"), as co-plaintiff. Plaintiff, who named fifteen defendants in the third amended complaint, seeks, *inter alia*, custody of her two minor children and compensatory damages based on her claims that defendants have interfered with her attempts to regain custody of the children, one of whom, Alejandro, has since reached the age of majority.

The chronology of relevant events giving rise to this complaint begins on or around January 2008, when plaintiff and her three sons, all victims of domestic

violence, began work on a "safety plan."  The following rather dramatic facts are taken from the complaint filed by plaintiff.  The children's father, Jan Frederick Lubbe ("Lubbe"), learned that plaintiff had been making financial arrangements and became involved in a physical altercation with plaintiff and her children.  Lubbe broke plaintiff's right arm, slashed Alejandro with a box cutter, and threatened to kill them if they spoke to police. (Doc. 11, p. 7).  Lubbe wrongfully withheld Alejandro's child support, his Social Security benefits, and plaintiff's Social Security disability benefits.  (Doc. 11, p. 8).

On March 11, 2008, plaintiff arrived home to find Lubbe conferring with a case worker from the Florida Department of Children and Families ("DCF").  DCF tried to have Alejandro involuntarily committed pursuant to the Florida Mental Health Act of 1971 ("Baker Act"), but a court denied the corresponding petitions.  On March 18, 2008, Rene Creteur ("Creteur"), a protective services investigator with DCF, explained to plaintiff that Alejandro would be admitted to a residential facility in Orlando for two weeks.  Creteur stated that she was in control and directed plaintiff to remain quiet.  (Doc. 11, p. 8).  Contrary to Creteur's assurances, Alejandro was admitted to a drug shelter unit at the direction of Jessica Gibson ("Gibson"), a supervisor at Big Bend Community Based Care ("Big Bend"), a child welfare services agency.  (Doc. 11, pp. 8-9).

On March 20, 2008, plaintiff contacted Big Bend and spoke with program director Mary Helen Barnes ("Barnes"), who "begged" her not to get an attorney. Plaintiff met with Barnes, who promised to remove plaintiff's son from the drug treatment shelter.  Plaintiff informed Barnes that, pursuant to court order, she was entitled to have Alejandro live at her house.  On March 24, 2008, Barnes called plaintiff and threatened to have her other two children, twin boys, removed from

plaintiff's home if plaintiff removed Alejandro from the drug treatment shelter. Barnes ordered plaintiff to meet with her at juvenile court the next day at 1:00 p.m. (Doc. 11, pp. 9-10).

On March 25, 2008, a hearing was held. Creteur and Barnes accused plaintiff of sexually and physically abusing her children. Creteur and Barnes requested that plaintiff be removed from her house. Plaintiff left the house that evening and did not return for six weeks, during which time her twins suffered physically and emotionally, and Alejandro was battered and assaulted in drug treatment. Plaintiff, who is disabled, was homeless for those six weeks, during which period Lubbe collected her disability benefits. (Doc. 11, p. 10).

On April 15, 2008, a Mr. Lacelle ("Lacelle") evaluated Alejandro for the Statewide Inpatient Psychiatric Program ("SIPP"). Lacelle recommended that Alejandro return home immediately and warned plaintiff that it would be detrimental for him to be institutionalized. Andrea Colbert ("Colbert"), a case worker for Big Bend, perjured herself, falsified a report, and told Judge James B. Fensom that Alejandro had run away from the drug treatment shelter. In fact, Alejandro was in the emergency room for injuries sustained when he was taken hostage at the shelter. Despite the injuries, Colbert refused to authorize a CT scan, in violation of the Fourth Amendment. (Doc. 11, p. 10).

On April 17, 2008, plaintiff submitted psychological and substance abuse evaluations, as well as a parenting skills assessment, to Big Bend. On the same, day, Alejandro attempted suicide after Colbert "instructed" the drug treatment shelter to impose cruel and unusual punishment in retaliation for Alejandro's reporting DCF to law enforcement. Judge Fensom ordered that Alejandro be removed immediately from the drug treatment shelter. Colbert, however, told the judge that she could not

recommend that plaintiff be returned home, because she had not received the various fitness evaluations plaintiff had personally delivered to Big Bend.  Colbert tried to blackmail plaintiff, telling her that she would arrange Alejandro's release in exchange for plaintiff's "documents."  (Doc. 11, p. 11).

On May 19, 2008, an emergency hearing was held on a petition to have Alejandro, who had been released from the shelter in Orlando, involuntarily committed under the Baker Act.  (Doc. 11, p. 11).  In contravention of plaintiff's "right to due process of law," Colbert, Lubbe, State Attorney Amy Thome ("Thome"), and Public Defender Mike Reiter ("Reiter") "conspired" to prevent plaintiff from being notified of the hearing.  (Doc. 11, pp. 11-12)  A hearing was also held on May 20, 2008, but Alejandro was denied his constitutional right to be heard.  On March 25, 2008, Thome conspired with Lubbe to accuse plaintiff of sexually abusing her sons.  Throughout the case, Thome failed to provide exculpatory evidence to Judge Fensom.  Colbert conspired with Lubbe with the intent to obtain financial gain.  Plaintiff petitioned Judge Fensom to remove Reiter from the case, because Reiter, too, failed to provide exculpatory evidence.  Colbert, Thome, and Lisa Coleman ("Coleman"), a supervisor with Big Bend, conspired to violate plaintiff's Fifth Amendment rights.  Colbert perjured herself and violated Alejandro's Eighth Amendment rights when she sent him to a sex offenders center in Bradenton, Florida.  (Doc. 11, p. 12).

On July 15, 2008, Lubbe battered plaintiff after she returned with her twins from Bradenton.  Lubbe conspired with state officials to "inflict cruel and unusual punishment" on plaintiff's sons.  Plaintiff met with an FBI agent on July 16, 2008, and explained the conspiracy to separate her from her children.  The agent directed plaintiff to report her complaints to the State Attorney's office.  (Doc. 11, p. 13).  On

July 17, 2008, plaintiff met with Assistant State Attorney Shalla Phelps ("Phelps") and explained the various constitutional wrongs that had been visited upon her. Phelps replied that there was nothing she could do and that she would not "get involved" with DCF, thereby "neglecting" her duty.  (Doc. 11, p. 14).

Plaintiff and her sons moved to Bradenton in the middle of July 2008, but Lubbe conspired with Colbert to interfere with plaintiff's receipt of disability insurance benefits.  Lubbe threatened plaintiff that he would abscond with her sons to "the Zulu jungle" if she did not pay him $10,000,000.00.  (Doc. 11, p. 14).  Lubbe injured plaintiff severely, bruising her ribs to such an extent that they stuck out. (Doc. 11, pp. 14-15).  On July 19, 2008, Lubbe again threatened plaintiff, explaining that DCF would never allow her to maintain custody of her children.  Plaintiff called the police on July 21, 2008, when Officer Chris Taylor ("Taylor") arrived at the hotel where plaintiff and her sons had been residing.  Taylor compiled a report of plaintiff's complaints, and Lubbe was charged with aggravated battery.  (Doc. 11, p. 15). Despite plaintiff's fear of retaliation, Taylor offered no information on services available to victims of domestic violence, thereby violating plaintiff's constitutional rights under the First and Ninth Amendments.  Without plaintiff's consent, Taylor proceeded to arrest Lubbe, who confessed to making false reports to DCF, but did not charge him for that offense.  (Doc. 11, p. 16).

At Taylor's instruction, plaintiff drove to Bradenton with Sherill Clark-Antas ("Clark-Antas").  (Doc. 11, p. 16).  On July 25, 2008, Lubbe was released on bond and told the local authorities that plaintiff had absconded with the twins.  An officer from the Manatee County Sheriff's Office arrived with the intent to arrest plaintiff. Colbert called the Sheriff's Office and stated that plaintiff had no parental rights and represented a danger to her sons, in violation of the "First, Fourth, and Fifth

Amendments."  Colbert also asserted that plaintiff had kidnapped her twins, was wanted in Bay County, and suffered from mental illness.  (Doc. 11, p. 17).

On August 9, 2008, plaintiff drove with her sons to Tallahassee, Florida, for a meeting with DCF Regional Investigator Anthony C. Jackson ("Jackson").  Colbert reported to Manatee Youth Center, where Alejandro had been staying, that Judge Fensom had signed a "no contact" order prohibiting contact between Alejandro and his mother.  Colbert, however, failed to produce such an order, which does not exist. (Doc. 11, p. 17).  Between August and December 2008, plaintiff saw Alejandro for a total of forty minutes, because Colbert, in conjunction with Coleman and Lubbe, lied about the issuance of a "no contact" order.  Colbert thus violated plaintiff's constitutional "right to familial association" and inflicted "cruel and unusual punishment" in violation of the Eighth Amendment.  (Doc. 11, p. 18).

Plaintiff met again with Jackson on August 11, 2008.  Jackson told plaintiff not to retain an attorney, because DCF would remedy the situation internally.  (Doc. 11, p. 18).  On August 20, 2008, the tires on plaintiff's truck were slashed, presumably by Lubbe, who left his "signature" three nails.  On August 21, 2008, plaintiff petitioned the Circuit Court for Manatee County for injunctive relief under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA").  Judge Scott M. Brownell granted an injunction, which granted to plaintiff temporary custody of the twins and prohibited contact between Lubbe and his minor sons. (Doc. 11, p. 19).

A hearing was held before Judge Brownell on September 3, 2008, on plaintiff's petition for a permanent injunction against domestic violence.  (Doc. 11, pp. 19-20). Plaintiff notified Clark-Antas of the hearing and faxed her the court records.  In violation of 42 U.S.C. § 1986, and the First and Ninth Amendments, Ms. Bryant, a domestic violence advocate with HOPE Family Services, attended the hearing and

advised plaintiff not to "disclose any information."   C. Michael Kelly ("Kelly"), counsel for Lubbe, told the court that plaintiff had absconded with the twins, that the children were not enrolled at any school, that Alejandro had sexually abused the twins, that plaintiff suffered from mental illness, addiction, and was endangering her children. (Doc. 11, pp. 20-21).  Kelly presented to the court documents "falsified" or "altered" by Colbert.  Lubbe concealed from the court the fact that aggravated battery charges were pending against him and that a "no contact" order had been entered against him. (Doc. 11, p. 21). Judge Brownell ordered a change of venue (to Bay County) and extended the injunction for protection against domestic violence, granting temporary custody of the children to plaintiff and prohibiting contact between Lubbe and his sons.  (Doc. 11, pp. 21-22).

On the same day of the hearing, Lubbe violated the terms and conditions of the injunction.  Lubbe obtained plaintiff's address and telephone numbers and began "terrorizing" her again.  On September 8, 2008, in Bay County, Lubbe, with the assistance of his attorney, Nancy Jones Gaglio ("Gaglio"), made out an affidavit under the UCCJEA to regain custody of the children.  Lubbe, however, stated that there were no pending cases or custody proceedings in any other venue, failing to advise the court of the injunction granted in Manatee County.  Lubbe also filed a petition for dissolution of marriage.  (Doc. 11, pp. 22-23).

On September 28, 2008, plaintiff attempted to file a notice of violation of injunction in the Bay County Family Court.  Sandra Childers ("Childers"), the Clerk of Court, failed to document plaintiff's notice or the receipt of records from the Manatee County Circuit Court.  (Doc. 11, pp. 23-24).  Childers "conspired" with Lubbe to violate "all" of plaintiff's "constitutional rights"  (Doc. 11, p. 24).  Lubbe and Clark-Antas "maliciously and intentionally" conspired with Colbert and Creteur

to violate plaintiff's constitutional rights.  (Doc. 11, pp. 24-25).

Plaintiff, having been instructed by the Manatee County Circuit Court that the injunction would expire if she did not petition for an injunction in Bay county, filed a petition for protection against domestic violence on October 15, 2008.  The petition was granted, and the court granted plaintiff temporary custody of her children. Plaintiff faxed Clark-Antas a copy of the injunction, but Clark-Antas conspired with Lubbe and Colbert to deprive plaintiff of her constitutional "rights and privileges and immunities."  (Doc. 11, p. 25).

On October 16, 2008, plaintiff took the twins to a safe house at HOPE's suggestion.  (Doc. 11, p. 25).  The same day, attorney Gaglio, on Lubbe's behalf, hand-delivered to Judge Richard Albritton a motion for temporary relief, seeking a child pick-up order and accusing plaintiff of absconding with her children.  Gaglio ultimately obtained a "false"child pick-up order.  In so doing, Gaglio violated plaintiff's constitutional rights.  Plaintiff met with Kim Ali ("Ali"), with DCF, and a detective from the Manatee County Sheriff's Office on October 17, 2008.  Plaintiff and her twins were interrogated separately, without their consent, in violation of the Fourth Amendment's prohibition against unreasonable search and seizure. (Doc. 11, p. 26).  On October 17, 2008, Clark-Antas gave to Gaglio plaintiff's new cell phone number and address, as well as documents relating to the injunction issued in Bay County.  Gaglio and Clark-Antas conspired in the "abduction" of plaintiff's twins. (Doc. 11, pp. 26-27).

At or around 6:30 p.m. on October 20, 2008, officers from the Manatee County Sheriff's Office surrounded the safe house.  After five hours of negotiations, plaintiff was ordered to "surrender" her twins to the Sheriff's Office, which she did the next day.  This was the last time plaintiff saw them.  Upon the advice of her attorney,

plaintiff requested a hearing before Judge Albritton, but Trish Reimer ("Reimer"), the Family Court Case Manager for the Fourteenth Judicial Circuit and Gaglio's former employee, "conspired" against plaintiff and refused to set a hearing. Reimer thus violated plaintiff's right to be heard under the Fourteen Amendment. (Doc. 11, p. 27).

On November 10, 2008, plaintiff filed a motion for an order of civil contempt under the UCCJEA. Reimer, however, replied by letter and, "impersonating" Judge Albritton, stated that the motion had been denied for lack of sufficient evidence. Judge Albritton entered an order of dissolution of marriage on December 2, 2008. At a hearing before Judge Albritton, Creteur stated, without supporting documentation, that plaintiff had lost her parental rights. Judge Albritton ordered an expedited hearing and instructed Gaglio to make the arrangements. This hearing has never been held, in violation of plaintiff's constitutional "opportunity to be heard." On December 16, 2008, Creteur called plaintiff and told her that Lubbe would never go to jail. The same day, plaintiff contacted Officer Taylor and filed a police report asserting that Lubbe had physically assaulted her and made false statements to DCF. In neglect of his official duty, Taylor responded, "I put him in jail once, I am not putting him in jail again." (Doc. 11, p. 28).

Plaintiff contacted the FBI on January 28, 2009, to report that her twins were missing. (Doc. 11, pp. 28-29). Special Agent Alexus Hatten ("Hatten") contacted DCF and spoke with Coleman, who told him that plaintiff had lost her parental rights. Plaintiff explained to Agent Hatten that Colbert, Creteur, Coleman, and Heather Hurd ("Hurd"), Superintendent for the Bay County Department of Juvenile Justice, had "conspired" with Lubbe to deny plaintiff contact with her children. Agent Hatten "checked out" plaintiff's version of events and found that plaintiff had not lost her

parental rights.  (Doc. 11, p. 29).

Plaintiff retained an attorney, Russell Ramey ("Ramey"), on February 10, 2009. Ramey determined that Lubbe had violated a number of legal prohibitions, including the UCCJEA and "the Hague," but refused to file suit in federal court or question any state employees.  Thus, Mr. Ramey "intentionally and willfully conspired" with Michelle Mohedano ("Mohedano"), a case worker for Big Bend, Gaglio, Lubbe, and Clark-Antas to violate plaintiff's constitutional rights.  On June 16, 2009, Mohedano abandoned Alejandro in an orphanage in Jacksonville.  (Doc. 11, p. 29).  Mohedano intentionally provided the Bay County Juvenile Court the wrong address for the orphanage and declined to mention that she had left Alejandro in "inhumane" conditions.  (Doc. 11, pp. 29-30).  Despite a transfer order issued by Judge Fensom, Alejandro was never transferred.  (Doc. 11, p. 30).

On November 5, 2009, Judge Fensom granted contact and visitation between Alejandro and the plaintiff.  Mohedano and Gibson, her supervisor at DCF, "retaliated" by having plaintiff arrested in November 2010.  (Doc. 11, p. 33).  On November 29, 2009, Agent Hatten instructed plaintiff to file suit in Tallahassee or Miami for a violation of the UCCJEA.  Plaintiff somehow found time, on December 5, 2009, to marry Ben Alexander, being given away by her son, Alejandro, by telephone, while Alejandro was "falsely incarcerated."  (Doc. 11, p. 30).  Two days later, Judge Alan Apte ordered that Alejandro be transported to Jacksonville within forty-eight hours.  Mohedano accused plaintiff in open court, before Judge Apte, of having lost her parental rights.  Mohedano explained further that plaintiff was required to comply with a "no-contact" order regarding her eldest son and that a *capias* had been issued for Alejandro's arrest in Duval County for failure to appear. Plaintiff arrived in Jacksonville the evening of December 7, 2009.  (Doc. 11, p. 30).

Plaintiff met with Alejandro's Public Defender on December 8, 2009.  The Public Defender stated that plaintiff had no parental rights and refused plaintiff's attempts to produce pertinent documentary evidence. (Doc. 11, p. 30).  On December 9, 2009, plaintiff tried to inquire with the Duval County Juvenile Court regarding Alejandro's whereabouts.  Local law enforcement determined that he was in neither Jacksonville nor Orlando.  Plaintiff arrived at Juvenile Court again on December 10, 2009.  At or around 10:30 a.m., Alejandro was escorted into the courthouse, where plaintiff learned that he had been picked up in Gainesville in the company of Mohedano. (Doc. 11, p. 31).

Alejandro has been incarcerated on numerous occasions and in different counties since July 2009.  Yet Alejandro's criminal record consists of stealing one-half of a sandwich, for which he was charged with petit theft, and firing a BB gun while playing in the backyard of a friend's house.  (Doc. 11, p. 31).  Colbert told Judge Fensom in April 2008 that Alejandro was "on runaway," when in fact he was in an Orlando hospital receiving emergency medical care.  Based on this false testimony, the judge issued a pick-up order, which order has been relied upon to arrest Alejandro seven times for failure to appear in court on the petit theft charge. Colbert and Mohedano have used this order for impermissible purposes, namely, to keep plaintiff separated from her son.  A second pick-up order, which was "falsified" by Coleman and Mohedano, is not valid.  (Doc. 11, p. 32).

On March 12, 2010, Judge Don Sirmons issued an order modifying a previous "no contact" order.  Laura McCarthy ("McCarthy"), plaintiff's Public Defender, told plaintiff on March 18, 2010, that a warrant had been issued for her arrest for the offense of passing worthless checks.  Plaintiff turned herself in immediately.  (Doc. 11, p. 33).  On March 25, 2010, Mohedano, Gibson, and Coleman filed a report

alleging, falsely, that plaintiff had failed to comply with a case plan.  In fact, plaintiff had never signed a case plan.  The named defendants thus conspired to violate plaintiff's civil rights.  (Doc. 11, p. 34).

Alejandro again attempted suicide on April 1, 2010, after speaking with Mohedano, who told him that plaintiff had abandoned him and did not love him. Gulf Coast Youth Academy ("GCYA"), Alejandro's residence at the time, prohibited further contact between Alejandro and Mohedano.  Plaintiff requested an emergency hearing before Judge Fensom, but the request was denied, in violation of plaintiff's constitutional "right to be heard."  On April 5, 2010, plaintiff filed a petition for injunctive relief after the Okaloosa County Sheriff's Office opened an investigation of Mohedano for sexual assault.  Judge Elijah Smiley scheduled a hearing for April 15, 2010, and issued an order to transport and an order prohibiting contact between Mohedano and Alejandro.  (Doc. 11, p. 34).  Childers, however, in "conspiracy" with Mohedano, altered the order to transport, designating Alejandro as the defendant, "with malicious and revengeful intent."  (Doc. 11, pp. 34-35).

A hearing was held in Bay County before Judge Brantley Clark, Jr., on April 15, 2010.  Judge Clark told plaintiff that she had no standing in court, and Mohedano and her counsel explained that plaintiff had no parental rights, had interfered with custody, and was on pretrial release.  Following the hearing before Judge Clark, Coleman had plaintiff served for a hearing in Dependency Court scheduled for the same day.  At the hearing, the court ordered Alejandro to take Seroquel XR, which is not approved for children under the age of eighteen.  By having Alejandro forcefully medicated, Mohedano violated Alejandro's constitutional "rights, privileges, and immunities."  (Doc. 11, p. 35).

Alejandro turned eighteen on June 27, 2010.  Plaintiff obtained documents

indicating that Mohedano had represented herself as Alejandro's legal guardian and parent.  Mohedano also represented to the courts of Duval County that plaintiff had lost her parental rights, and prevented plaintiff from discovering any information regarding Alejandro's whereabouts, welfare, and legal matters.  Mohedano, however, did not produce a court order or otherwise document her standing as Alejandro's rightful guardian.  (Doc. 11, p. 35).  On June 28, 2010, Judge Fensom signed an order, prepared by DCF, terminating plaintiff's "jurisdiction" over Alejandro.  (Doc. 11, p. 36).

In July 2010, plaintiff, apparently having access to medical care, took a few days to have open, double lumbar fusion.  (Doc. 11, p. 36).  Once back in action, plaintiff contacted Missing and Exploited Children ("MEC") on August 16, 2010.  An MEC case manager told plaintiff that her twins had "been located and then taken away" and that Lubbe reported that she had violated an initial custody order.  MEC instructed plaintiff that she should request to have her case reopened, which she did the following day.  Plaintiff explained that Lubbe and Gaglio, in conjunction with Clark-Antas, distorted the sequence of preceding events and thereby obtained an ex parte pick-up order from the court in Bay County.  (Doc. 11, p. 36).  Plaintiff last saw her twins when she surrendered them to the Manatee County Sheriff's Office on October 22, 2008.  (Doc. 11, pp. 36-37).  Alejandro completed his program at GCYA on October 26, 2010, and has since returned home.

Based on the foregoing, plaintiffs assert a multitude of constitutional claims against the named state officials, private citizens,  and their conspirators for, *inter alia*, extortion, theft, slander, fraud, blackmail, forgery and falsification of documents, false imprisonment, corporal punishment, "isolation," "denied education," torture, retaliation, conspiracy, perjury, "a bible," "endangerment," identity theft, and

organized crime. (Doc. 11, p. 37). Plaintiff seeks, *inter alia*, enforcement of an order returning the twins to her custody, enforcement of the UCCJEA, and unspecified compensatory damages. (Doc. 11, pp. 46-47).

DISCUSSION

Because plaintiff is proceeding *in forma pauperis*, the court may dismiss the case if satisfied that the action is "(i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). The court must read plaintiff's *pro se* allegations in a liberal fashion. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). Dismissals for failure to state a claim are governed by the same standard as FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6). *See Mitchell v. Farcass*, 112 F.3d 1483, 1485 (11th Cir. 1997). In determining whether the complaint states a claim upon which relief may be granted, the court accepts all factual allegations in the complaint as true and evaluates all reasonable inferences derived from those facts in the light most favorable to the plaintiff. *See Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994). The complaint may be dismissed if the facts as pleaded do not state a claim to relief that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (retiring the negatively-glossed "no set of facts" language previously used to describe the motion to dismiss standard and dismissing plaintiffs' case for failure to state a claim, because plaintiffs had "not nudged their claims across the line from conceivable to plausible"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009).

Under FEDERAL RULE OF CIVIL PROCEDURE 8(a)(2), a pleading must contain

a "short and plain statement of the claim showing that the pleader is entitled to relief."
As the Supreme Court reiterated in *Iqbal*, 129 S. Ct. at 1949, although RULE 8 does
not require detailed factual allegations, the rule does demand "more than an
unadorned, the-defendant-unlawfully-harmed-me accusation." The mere possibility
that the defendant acted unlawfully is insufficient to survive dismissal for failure to
state a claim. *See id.* Rather, the complaint must include "[f]actual allegations . . .
[sufficient] to raise a right to relief above the speculative level," that is, "across the
line from conceivable to plausible . . . ." *See Twombly*, 550 U.S. at 555, 570.

A complaint is also subject to dismissal for failure to state a claim when the
allegations—on their face—show that an affirmative defense bars recovery on the
claim. *See Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1022 (11th Cir. 2001); *see
also Jones v. Bock*,  549 U.S. 199, 215 (2007) (reiterating that principle and
providing, as an example, that if a complaint's allegations show that relief is barred
by the applicable statute of limitations, the complaint is subject to dismissal for
failure to state a claim).

*Jurisdiction and the Rooker-Feldman Doctrine*

A rule of jurisdiction announced in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413
(1923), and reaffirmed by *District of Columbia Court of Appeals v. Feldman*, 460
U.S. 462, 482 & n.16 (1983), "[t]he *Rooker-Feldman* doctrine recognizes that federal
courts, other than the Supreme Court, do not have jurisdiction to review final state
court decisions." *McGee v. Kell*, 335 F. App'x 3, 4 (11th Cir. 2009); *see also Redford
v. Gwinnett Cnty. Jud. Cir.*, 350 F. App'x 341, 344 (11th Cir. 2009) ("Under the
*Rooker-Feldman* doctrine, federal courts lack subject-matter jurisdiction over certain
matters related to previous state court litigation."); *Goodman ex rel. Goodman v.
Sipos*, 259 F.3d 1327, 1332 (11th Cir. 2001).  "The doctrine applies . . . to 'cases

brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Id.* (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)); *see also Powell v. Powell*, 80 F.3d 464, 466 (11th Cir. 1996) ("The doctrine applies not only to claims actually raised in the state court, but also to claims that were not raised in the state court but are 'inextricably intertwined' with the state court's judgment."). "A federal claim is inextricably intertwined with a state court judgment 'if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it.'" *Siegel v. LePore*, 234 F.3d 1163, 1172 (11th Cir. 2000) (en banc) (quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25 (1987) (Marshall, J., concurring)).

Application of the jurisdictional rule articulated by *Rooker-Feldman* is determined by reference to a four-part standard. *See Morris v. Wroble*, 206 F. App'x 915, 918 (11th Cir. 2006); *Storck v. City of Coral Springs*, 354 F.3d 1307, 1310 n.1 (11th Cir. 2003). "A federal district court does not have jurisdiction to review state-court decisions where: (1) the party in federal court is the same as the party in state court; (2) the prior state-court ruling was a final or conclusive judgment on the merits; (3) the party seeking relief in federal court had a reasonable opportunity to raise its federal claims in the state-court proceeding; and (4) the issue before the federal court was either adjudicated by the state court or was inextricably intertwined with the state court's judgment." *Morris*, 206 F. App'x at 918; *see also Redford*, 350 F. App'x at 344-45 n.2.

The instant case fits squarely within the narrow confines of the *Rooker-Feldman* doctrine. Plaintiff's complaint is an explicit attempt to use the federal courts to overturn the Florida state courts' decisions regarding custody of her children. Mrs.

Alexander seeks, *inter alia*, the "return" of her twins and compensatory damages. (Doc. 11, p. 46). Plaintiffs, however, were parties to the allegedly injurious state actions, which resulted in final judgments. In addition, plaintiffs do not allege any facts that would support a finding that Mrs. Alexander was unable to raise in those proceedings the alleged constitutional abuses or state law claims she raises in the instant cause of action. Instead, it appears that virtually all the allegations made in this action were raised in state court, but, according to plaintiff, were overlooked or ignored. In particular, the multitudinous claims of perjury, conspiracy, and falsified documents, are exactly the types of matters that would be raised in the serial child custody proceedings described in the complaint. The state courts rendered determinations adverse to Mrs. Alexander, who now asks a federal tribunal for relief that would, in essence, overturn those state court decisions. Such collateral review of state court decisions is barred by the *Rooker-Feldman* doctrine, which operates to foreclose federal jurisdiction in this case. *See, e.g.*, *Redford*, 350 F. App'x at 344-45 (applying *Rooker-Feldman* jurisdictional bar to plaintiff's § 1983 action against Georgia county judicial circuit, several judges, and county's child support services, alleging due process violations related to state court proceedings regarding his child custody arrangement, because action was "an explicit attempt to use the federal courts to overturn the Georgia state courts' decisions"); *Doe v. Pryor*, 344 F.3d 1282, 1286 (11th Cir. 2003) (observing that *Rooker-Feldman* would preclude federal judicial review of state-court custody determination); *Liedel v. Juv. Ct. of Madison Cnty., Ala.*, 891 F.2d 1542, 1545 (11th Cir. 1990) (dismissing complaint for lack of jurisdiction under *Rooker-Feldman* where parents dissatisfied with state court's child custody determinations brought § 1983 suit seeking injunctive relief against Department of Human Resources and Juvenile Court, because relief requested "would

effectively nullify those state orders"); *Staley v. Ledbetter*, 837 F.2d 1016, 1017 (11th Cir. 1988) (holding that *Rooker-Feldman* deprived district court of jurisdiction over plaintiff's § 1983 claim in which she requested reinstatement of parental custody based on alleged violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment, because plaintiff "in essence sought to reverse a state court's child custody determination").

As noted above, in this case plaintiffs seek injunctive relief that would prevent the enforcement of state-court child custody orders.   Plaintiffs also seek compensatory damages based on the alleged constitutional violations visited upon them by various state and non-state actors.  Nevertheless, the fact that plaintiffs seek damages, in addition to injunctive relief, does not allow their claims to evade application of the *Rooker-Feldman* jurisdictional bar.  The U.S. Court of Appeals for the Eleventh Circuit does not distinguish between cases in which a plaintiff seeks relief that would directly prevent enforcement of a state-court order and cases in which a plaintiff seeks damages under § 1983 based on issues related to the state cause of action.  *See Sipos*, 259 F.3d at 1333.  Rather, Eleventh Circuit decisions "focus on the federal claim's relationship to the issues involved in the state court proceeding, instead of on the type of relief sought by the plaintiff." *Id.* (citing *Siegel*, 234 F.3d at 1172).  In *Liedel*, for example, even though part of the relief sought was damages from the Alabama Department of Human Resources, the court held that the plaintiffs' claims were barred under *Rooker-Feldman* because their complaint essentially sought "to challenge the final state court judgment." *See* 891 F.2d at 1544-46.  In *Staley*, 837 F.2d at 1017, the court applied the *Rooker-Feldman* jurisdictional bar against claims that, in part, sought damages to pay for psychiatric care.  Such case law indicates that "[t]he *Rooker-Feldman* doctrine is broad enough

to bar all federal claims which were, or should have been, central to the state court decision, even if those claims seek a form of relief that might not have been available from the state court." *Sipos*, 259 F.3d at 1333.

In the absence of subject matter jurisdiction, this court does not have discretion to pass judgment upon plaintiffs' claims. *See id.* at 1332 n.6. Rather, "[a] federal court must always dismiss a case upon determining that it lacks subject matter jurisdiction, regardless of the stage of the proceedings, and facts outside of the pleadings may be considered as part of that determination." *Id.* (citing *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001) ("[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises."). Having advanced claims that in essence seek to reverse a state court's child custody determination—thus divesting this court of jurisdiction—plaintiffs fail to state a claim upon which relief may be granted. *See Staley*, 837 F.2d at 1018.

*Failure to State a Claim Under Rule 8(a)(2)*

*Rooker-Feldman* and its progeny abrogate subject matter jurisdiction in this case. For purposes of this report and recommendation, the complaint also fails under the standards announced in *Iqbal*, because it does not state a claim upon which relief may be granted. Far from presenting a "short and plain" statement of the claim as instructed by FEDERAL RULE OF CIVIL PROCEDURE 8(a)(2), plaintiffs' complaint is discursive and unwieldy. Moreover, the complaint is littered with conclusory statements, temporal and spatial inconsistencies, "factual" circumstances that have already been resolved by the state courts, and legal theories not contemplated, let

alone recognized or established, in the collected body of constitutional law.  So constituted, the complaint does not give the myriad defendants "'fair notice of what the . . . claim is and the grounds upon which it rests,'" *see Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)), and therefore does not allow for an informed responsive pleading.  Even when construed in the most liberal fashion, the factual content offered does not allow the court to draw a reasonable inference that the defendants are liable for the misconduct alleged.  *See Iqbal*, 129 S. Ct. at 1949.  Because the complaint does not articulate a plausible claim for relief under any construction of the facts, this cause of action should also be dismissed for failure to state a claim.  *See id.* at 1950.

Accordingly, it is respectfully RECOMMENDED:

1.  That plaintiffs' claims be DISMISSED WITH PREJUDICE under 28 U.S.C. § 1915(e)(2)(B)(ii), for lack or jurisdiction and for failure to state a claim upon which relief may be granted.

2.  That the clerk be directed to close the file.

At Pensacola, Florida this 16th day of April, 2012.

*/s/ Charles J. Kahn, Jr.*
CHARLES J. KAHN, JR.
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).